UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
WESTERN DIVISION


**JIMMY HUDSON**,                                     Case Number 3:10 CV 1649

                    Plaintiff,                        Magistrate Judge James R. Knepp, II

        v.                                            MEMORANDUM OPINION AND ORDER

**MARJORIE HENDERSON, et al.**,

                    Defendants.


### Introduction

This is a 42 U.S.C. § 1983 action resulting from the security screening of a visitor to the

North Central Correctional Institute. Pending before the Court is Defendant's Motion for Summary

Judgment and Plaintiff's Motions to Strike and Motions in Limine.

The District Court has jurisdiction over this case under 28 U.S.C. § 1331. The parties have

consented to the exercise of jurisdiction by the undersigned in accordance with 28 U.S.C. § 636(c)

and Civil Rule 73. (Doc. 19).

Plaintiff filed a Motion to Strike Defendants' Expert Report and a Motion in Limine (Doc.

25), to which Defendants filed a Response (Doc. 31). Defendants filed a Motion for Summary

Judgment (Doc. 28) to which Plaintiff filed a Response (Doc. 34). Defendants then filed a Reply

(Doc. 37). Plaintiff subsequently filed another Motion to Strike (Doc. 38) to which Defendants filed

an Opposition (Doc. 39). Plaintiff then filed a Reply. (Doc. 40). Plaintiff also filed a Motion in

Limine. (Doc. 44). For the reasons given below, the Court grants Defendants' Motion for Summary

Judgment and denies Plaintiff's Motions as moot.

**Background**

This case stems from an incident that occurred at the North Central Correctional Institute (NCCI) on the morning of April 7, 2010. (Doc. 27, at 22-23). Plaintiff, Jimmy Hudson, had been employed by AVI as a vending machine attendant since September of 2009. (Doc. 27, at 17). His job responsibilities included visiting NCCI to fill vending machines with various snack items, fill the coin returns, take inventory, and collect the money inside the machines. (Doc. 27, at 17-20). The food inventory Plaintiff needed to fill the machines was always stored inside in the facility, so Plaintiff did not enter the facility carrying such items. (Doc. 27, at 25). On account of it being a prison, any visitors entering NCCI must pass through a security checkpoint that includes a metal detector. (Doc. 34-1, at 2).

On the morning in question, Plaintiff attempted to enter NCCI as part of his daily work routine but set off the metal detector. (Doc. 27, at 25). This was the first time Plaintiff had ever triggered the metal detector entering NCCI. (Doc. 27, at 25-26). After the detector beeped, Plaintiff turned around and walked back through the detector without being instructed to do anything. (Doc. 27, at 26). The detector beeped again. (Doc. 27, at 26). After this second try, Defendant Marjorie Henderson - the Correction Officer on duty at the security checkpoint that morning - told Plaintiff to remove his belt. (Doc. 27, at 26, 28). Plaintiff did so, then walked back through the metal detector, and set it off for a third time. (Doc. 27, at 28). Plaintiff then walked back around, took his shoes off, and walked through the detector a fourth time, setting it off once again. (Doc. 27, at 28, 34). Without removing any further clothing, Plaintiff walked through the detector a fifth time whereupon the detector beeped yet again. (Doc. 27, at 38).

After watching Plaintiff set the detector off five times, Defendant Henderson pulled out a

2

magnetometer wand and used it to scan Plaintiff's body for metal. (Doc. 27, at 39). According to

Plaintiff's deposition testimony, the wand made noise around Plaintiff's shoulders and neck. (Doc.

27, at 39). What happened next is disputed, but Plaintiff maintains that Defendant Henderson said

something to Defendant Buck who replied that Plaintiff must clear the metal detector. (Doc. 27, at

40, 75). Then, Defendant Henderson allegedly said something to Plaintiff along the lines of, "You'll

have to take your pants off." (Doc. 34-2, at 1; 27, at 42). Defendant Henderson denied having said

this to the NCCI Hearing Officer who investigated the incident. (Doc. 34-2, at 1).

What is not disputed is the action Plaintiff took after whatever was said to him by Defendant

Henderson. Plaintiff removed his pants, went through the metal detector and finally cleared it. (Doc.

27, at 42). There were a few other people in the room at the time who saw this happen. (Doc. 27, at

42). After clearing the detector, Plaintiff proceeded into the prison to perform his job. (Doc. 27, at

46).

The incident at the security checkpoint was captured on surveillance video, although without

audio. The video shows Defendant Henderson laughing while Plaintiff walked through the detector

without his pants on. (Plaintiff's Ex. 2, at 4:34-4:45). After Plaintiff leaves the room, Defendant

Henderson is seen talking on the phone while still smiling and chuckling. (Plaintiff's Ex. 2, at 7:47,

8:06). This corroborates Plaintiff's testimony that somebody called the other dorms and told them

what had happened. (Doc. 27, at 46-47). When Plaintiff ventured throughout the prison to do his job

that day, people were laughing and joking, presumably because word had spread about the incident.

(Doc. 27, at 47-48). In particular, Plaintiff heard somebody make the joke, "I think she needs to buy

you a steak dinner." (Doc. 27, at 48). The warden also joked with Plaintiff about the incident the

next day. (Doc. 27, at 50).

The video clarifies that Defendant Buck was in the room watching Plaintiff go back and forth through the metal detector several times, but appears to have left the room about ten seconds before Plaintiff walked through the detector without his pants on. (Plaintiff's Ex. 2, at 1:45-4:23).

Plaintiff filed the instant suit alleging he suffered "considerable damage" in the form of humiliation, embarrassment, and emotional distress as a result of Defendants violating his Fourth, Fifth, and Fourteenth Amendment rights. (Doc. 1, at 4-5). Plaintiff never sought professional help for mental or emotional distress. (Doc. 27, at 79).

## Standard of Review

Pursuant to Federal Civil Rule 56(c), summary judgment is appropriate where there is "no genuine issue as to any material fact" and "the moving party is entitled to judgment as a matter of law." *Id.* When considering a motion for summary judgment, the Court must draw all inferences from the record in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The Court is not permitted to weigh the evidence or determine the truth of any matter in dispute; rather, the Court determines only whether the case contains sufficient evidence from which a jury could reasonably find for the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).

## Analysis

Qualified Immunity

Though 42 U.S.C. § 1983 contains no immunity provisions, the Supreme Court has read the statute "in harmony with general principles of tort immunities and defenses rather than in derogation of them." *Malley v. Briggs*, 475 U.S. 335, 339 (1986) (quoting *Imbler v. Pachtman*, 424 U.S. 409, 418 (1976)). Accordingly, questions of immunity under § 1983 are determined primarily by common

law immunities at the time the Civil Rights Act was enacted in 1871, though not all common law

immunities have been incorporated into it. *Id.* Qualified immunity recognizes the burden of trial is

unjustified in the face of a colorable claim that the action taken was reasonable in light of unclear

law. *Will v. Hallock*, 546 U.S. 345, 353 (2006). It ensures that damages suits do not "unduly inhibit

officials in the discharge of their duties" by burdening individual officers with "personal monetary

liability and harassing litigation." *Anderson v. Creighton*, 483 U.S. 635, 638 (1987).

In *Pearson v. Callahan*, 555 U.S. 223 (2009), the Supreme Court addressed the question of

constitutional avoidance with respect to §1983 actions involving qualified immunity. The Court

allowed lower courts to, in sound discretion, deviate from the previously mandated procedure set

forth in *Saucier v. Katz*, 533 U.S. 194 (2001). *Pearson*, 555 U.S. at 236. In *Saucier*, the Court set

up a two-prong process of analysis for such questions:

> First, a court must decide whether the facts that a plaintiff has alleged [or shown]
> make out a violation of a constitutional right. Second, if the plaintiff has satisfied this
> first step, the court must decide whether the right at issue was "clearly established"
> at the time of defendant's alleged misconduct. Qualified immunity is applicable
> unless the official's conduct violated a clearly established constitutional right.

*Pearson*, 555 U.S. at 232 (citing *Saucier*, 533 U.S. at 201) (quoting *Anderson v. Creighton*, 483 U.S.

635, 640 (1991)). Following this procedure, though no longer mandatory, is often beneficial for

judicial economy. *Pearson*, 555 U.S. at 236.

If there has been a constitutional violation, the inquiry into whether the law was "clearly

established" or not turns on the "objective legal reasonableness of the action, assessed in light of the

legal rules that were clearly established at the time." *Wilson v. Layne*, 526 U.S. 603, 614 (1999). As

the Court explained in *Anderson v. Creighton*, 483 U.S. 635 (1987), "[t]he contours of the right must

be sufficiently clear that a reasonable official would understand that what he is doing violates that

5

right." *Id.* at 640.

The Supreme Court has applied this framework in the context of strip searches, in *Safford Unified School Dist. No. 1 v. Redding*, 129 S. Ct. 2633 (2009). In *Safford*, a school principal subjected a middle school student to a search of her bra and underpants on reasonable suspicion she was hiding forbidden prescription drugs on her person. *Id.* at 2637. The Court ultimately found that the search was a violation of the student's Fourth Amendment rights. *Id.* at 2642 ("Here, the content of the suspicion failed to match the degree of intrusion."). But because the law on school strip searches was not well established at the time, the Court held that qualified immunity applied to protect the principal from personal liability even though the search was unreasonable. *Id.* at 2644.

Thus, whether Defendants are entitled to judgment as a matter of law based on qualified immunity depends on whether Defendants violated a clearly established constitutional right of Plaintiff.

<u>The Search</u>

The Fourth Amendment requires state actors to respect "[t]he right of the people to be secure in their persons . . . against unreasonable searches and seizures." *Chandler v. Miller*, 520 U.S. 305, 308 (1997) (quoting U.S. Const. Amend. IV). Under *Katz v. U.S.*, 389 U.S. 347, there is a two-part test to determine whether a search has occurred: First, the individual must have exhibited an actual (subjective) expectation of privacy, and, second, the expectation must be one that society is prepared to recognize as reasonable. *Id.* at 361 (Harlan, J., concurring).

Defendants argue that no Fourth Amendment search occurred when Plaintiff removed his pants to clear the metal detector. Plaintiff points to Ohio Revised Code § 5120.421, which defines "strip search" in the prison context as:

> [A]n inspection of the genitalia, buttocks, breasts, or undergarments of a person that is preceded by the removal or rearrangement of some or all of the person's clothing that directly covers the person's genitalia, buttocks, breasts, or undergarments and that is conducted visually, manually, by means of any instrument, apparatus, or object, or in any other manner.

Ohio Rev. Code § 5120.421(A)(5). Further, before a visitor may be strip searched, the Code requires the highest officer in the institution to provide them with a written statement detailing why the search is necessary. Ohio Rev. Code § 5120.421(D). Obviously, an Ohio statute is not determinative with respect to Fourth Amendment rights, but it helps show what society is prepared to recognize as reasonable.

Given the dangerous nature of prisons, a person entering such a place cannot reasonably have an expectation of privacy to the same extent as elsewhere. The Sixth Circuit has noted this and shown deference to corrections officers for visitor searches:

> The Fourth Amendment does not afford a person seeking to enter a penal institution the same rights that a person would have on public streets or in a home . . . In seeking entry to such a controlled environment, the visitor simultaneously acknowledges a lesser expectation of privacy . . . [T]he Court has consistently '[struck] the balance in favor of institutional security,' and accorded great weight to the 'professional expertise of corrections officials.'

*Spear v. Sowders*, 71 F.3d 626, 629-630 (6th Cir. 1995) (quoting *Hudson v. Palmer*, 468 U.S. 517, 527 (1984)). In *Spear*, corrections officers conducted a body cavity search on a visitor to a prison. *Id.* at 629. The Court held the Fourth Amendment required reasonable suspicion before authorizing a body cavity search, and said this rule had been "clearly established" at the time of the search. *Id.* at 630. The standard for strip searches of prison visitors was further explained:

> [P]rison authorities have much greater leeway in conducting searches of visitors. Visitors can be subjected to some searches, such as pat-downs or a metal detector sweep, merely as a condition of visitation, absent any suspicion. However, because a strip and body cavity search is the most intrusive search possible, courts have attempted to balance the need for institutional security against the remaining privacy

7

> interests of visitors. Those courts that have examined the issue have concluded that even for strip and body cavity searches prison authorities need not secure a warrant or have probable cause. However, the residual privacy interests of visitors in being free from such an invasive search requires that prison authorities have at least a reasonable suspicion that the visitor is bearing contraband before conducting such a search.

*Id.* at 630. Reasonable suspicion is less than probable cause and does not even equate to a preponderance of the evidence; it requires only "specific objective facts upon which a prudent official, in light of his experience, would conclude that illicit activity might be in progress." *Id.* at 631 (citing *Terry v. Ohio*, 392 U.S. 1, 30 (1968)).

Courts that have considered searches after metal detector alarms have concluded that activation of a metal detector alone does not necessarily amount to reasonable suspicion, though it can when combined with certain surrounding circumstances. In *United States v. Ford*, 333 F.3d 839 (7th Cir 2003), the Seventh Circuit held that activation of a metal detector at a checkpoint where patrons are not asked to remove benign metal objects, and are not provided with a place to remove any such objects, did not amount to reasonable suspicion. *Id.* at 844-845. However, the Court limited its ruling to the circumstances of the checkpoint at issue, carefully explaining that its holding was consistent with cases around the country where activation of metal detectors amounted to reasonable suspicion because of extra steps taken to improve the accuracy of the test. *Id.* at 845.

The Sixth Circuit has found reasonable suspicion from the activation of a metal detector. *U.S. v. Dalpiaz*, 494 F.2d 374 (6th Cir. 1974). The issue in *Dalpiaz* came up in the context of airport searches, but the Court upheld the search of a passenger who triggered the metal detector three times before clearing it. *Id.* at 377 ("We believe the facts of this case bring it within the rule of *Terry v. Ohio* . . . . A number of airport searches [after] activation of a magnetometer have been upheld in reliance on *Terry*."). Similarly, in *United States v. Epperson*, 454 F.2d 769 (4th Cir. 1972) the Fourth

8

Circuit upheld a frisk after the individual set off a metal detector for a second time, having been told to empty his pockets of metal objects between failed attempts. *Id.* at 770, 772 ("When the high metal indication of the magnetometer was not satisfactorily explained by Epperson, the subsequent physical 'frisk' of his jacket was entirely justifiable and reasonable under *Terry*."). Thus, as long as the surrounding circumstances indicate reliability of the test (by, for example, allowing multiple attempts to clear the detector and advising the individual to empty their pockets and remove benign metal objects), courts are comfortable finding that repeated triggering of a metal detector gives rise to reasonable suspicion.

Here, the video shows Plaintiff triggered the metal detector at least five times. (Plaintiff's Ex. 2, at 1:55-2:51). Defendant Henderson advised him to remove his belt after the second failed attempt, and Plaintiff did so. (Doc. 27, at 26, 28). After five failed attempts, Defendant used a wand magnetometer on Plaintiff which still gave an unsatisfactory reading. (Plaintiff's Ex. 2, at 3:02-3:30). Under the totality of circumstances here, the Court is persuaded that reasonable suspicion existed for a more intrusive search of Plaintiff. As such, Defendants' actions were not so unreasonable or contrary to a clearly established constitutional right as to deprive them of the protection of qualified immunity.

Viewing the facts in a light most favorable to Plaintiff, a search did occur. However, regardless of what this particular search is termed (whether it was a strip search or not), Defendants acted within the boundaries of constitutional reasonableness. In the context of visitors entering a penal institution, reasonable suspicion that the individual is bearing contraband is all the Fourth Amendment requires to conduct a more intrusive cavity search, let alone a search involving only the removal of outer pants. *See Spear*, 71 F.3d at 630. Therefore, the dispute over what exactly

Defendant Henderson said to Plaintiff is not material. Even if Defendant Henderson ordered Plaintiff to remove his pants, under the circumstances, it did not violate a clearly established constitutional right of Plaintiff. The five failed attempts to clear the metal detector that included the removal of Plaintiff's belt and shoes gave rise to reasonable suspicion that he was bearing contraband.

It should also be noted that even if Defendants were not protected by qualified immunity, what occurred at the security checkpoint was probably not a "strip search" for Fourth Amendment purposes. Courts around the country examining invasive search procedures under the Fourth Amendment have emphasized nudity as a critical aspect to any strip search. The exposure of one's "naked body to scrutiny by government officers" is precisely what makes strip searches so invasive. *Allison v. GEO Group, Inc.*, 611 F. Supp 2d 433, 453 (E.D. Pa. 2009). *See Kelsey v. County of Schoharie*, 567 F.3d 54, 62 (2nd Cir. 2009) ("The term 'strip search' is used generally to describe any inspection of the naked body."); *N.G. v. Connecticut*, 382 F.3d 225, 228 (2nd Cir. 2004) ("'Strip search' is often used as an umbrella term that applies to all inspections of *naked* individuals.") (emphasis added); *see also Peckham v. Wisconsin Dept. Of Corrections*, 141 F.3d 694, 695 (7th Cir. 1998) ("We use the term 'strip search' to refer to a visual inspection of a naked inmate without intrusion into the person's body cavities."). The fact that Plaintiff never removed his underwear likely defeats any claim that this was a strip search for constitutional purposes.

Furthermore, the fact that Defendants may have violated the Ohio statute on strip searches does not prevent them from being shielded by qualified immunity. Ohio statutes do not define the contours of federal constitutional rights, but, rather, are subordinate to them. U.S. Const. Art. VI, § 2. Defendants are protected by qualified immunity, and are entitled to judgment as a matter of law.

**Plaintiff's Motions to Strike and Motion in Limine**

10

Plaintiff moved to strike the testimony of Defendants' proposed expert, Ron Pawlus, and to preclude him from testifying at trial. (Doc. 25). In response, Defendants moved to substitute Major David Marquis as their respective expert witness. (Doc. 31, at 2). Plaintiff further moved to strike arguments made by Defendants for the first time in their Reply. (Doc. 38). Defendants filed an Opposition. (Doc. 39). Plaintiffs then filed a Motion in Limine to exclude evidence concerning the ODRC Policy on strip searches. (Doc. 44). Because the Court would have reached the same conclusion even if it had granted all of Plaintiff's pending Motions, these Motions are denied as moot.

### Conclusion

For the foregoing reasons, Plaintiff's Motions to Strike and Motions in Limine are denied, and Defendants' Motion for Summary Judgment is granted. The case is dismissed.

IT IS SO ORDERED.

s/James R. Knepp II
United States Magistrate Judge
